212 P.3d 842

In re the Matter of Devon S. ENGEL,
Petitioner/Appellant/Cross–
Appellee,

v.

Julie Kay LANDMAN,
Respondent/Appellee/Cross–Appellant.

No. 1 CA–CV 07–0587.

Court of Appeals of Arizona,
Division 1, Department A.

April 30, 2009.

Sternberg & Singer, Ltd. By Melvin Sternberg, Phoenix, Attorneys for Petitioner/Appellant/Cross–Appellee.

The Cavanagh Law Firm, PA By Christina S. Hamilton, Phoenix, Attorneys for Respondent/Appellee/Cross–Appellant.

## OPINION

SWANN, Judge.*

¶ 1 This is an appeal and cross-appeal from orders modifying the amount of child support Devon Engel ("Father") is to pay Julie Landman ("Mother"). We hold that the trial court erroneously attributed hypothetical income and childcare expenses to a voluntarily unemployed parent because the Arizona Child Support Guidelines do not support the use of such attribution to increase the burden on the employed parent. We further hold

that the court erred in computing Father's stock option income.

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 The parties were divorced pursuant to a consent decree in July 2004. The decree provided that Father would pay $2,000 per month in child support—$73 more than that prescribed by the Arizona Child Support Guidelines. *See* Arizona Revised Statutes ("A.R.S.") § 25–320 app. (2007) ("Guidelines"). At that time, Father's income was $25,000 per month and Mother was not employed.

¶ 3 Father filed a petition to modify child support in September 2006. In support of his contention that there had been the necessary continuing and substantial change of circumstances, Father presented evidence that Mother's investment assets had substantially increased as a consequence of her receipt of an inheritance from her father and an annuity from his former employer. The court ultimately found that Mother's monthly income, excluding spousal maintenance, exceeded $13,000. Because Mother was voluntarily unemployed, Father also sought to attribute income to her in an amount equal to her earning potential as an accountant. Mother responded that Father's employment income had risen dramatically and his child support obligation therefore should increase, not decrease. Mother also argued that any income the court chose to attribute to her should be offset by the childcare costs that would be necessitated by full time employment, and warned that the result might be an increase in child support. Mother also asserted that the parties' investment portfolios, each substantially exceeding $1,000,000, should be treated as a "wash."

¶ 4 Despite the parties' respective assertions that each endeavored to settle the matter, and the fact that the amounts in dispute are small compared to their personal resources (and the cost of the litigation), the parties litigated the issues vigorously. The family court held a two-day evidentiary hear-

---

* Pursuant to Article VI, Section 3 of the Arizona Constitution, the Arizona Supreme Court desig- nated the Honorable Peter B. Swann, Judge of the Arizona Superior Court, to sit in this matter.

ing. On June 18, 2007, the court modified the child support order downward to $1,686.99 per month. It also awarded Mother her attorneys' fees. Father filed a motion for new trial, to which Mother did not substantively respond, and a response to Mother's fee application, to which Mother did not reply. Before the court ruled on the motion for new trial, Father filed a notice of appeal on July 19, 2007. Mother filed a notice of cross-appeal on August 14, 2007.

¶ 5 On September 11, 2007, the court ruled on Father's motion for new trial. Though the court ruled against Father on several significant issues, including the calculation of his gross income and the attribution of income and childcare costs to Mother, it ruled in his favor on a few minor adjustments to educational and childcare expenses that had the net effect of lowering his support obligation further still. In the September 11 minute entry, the court also vacated the fee award in Mother's favor. On September 17, 2007, unaware of the court's ruling, Father sought to withdraw his motion for new trial. The September 11 minute entry was filed on September 21, 2007. On September 21, 2007, after learning of the ruling, Father sought to withdraw his previous motion to withdraw the motion for new trial. Mother objected and on September 27, 2007, filed a motion to strike the court's September 11 order.

¶ 6 On October 9, 2007, Father filed a supplemental notice of appeal from the September 11 order and from the earlier order modifying his support obligation. On November 21, 2007, in an unsigned minute entry, the court granted Father's request to withdraw his motion to withdraw his motion for new trial and denied Mother's motion to strike the ruling on the motion for new trial. On November 30, 2007, Mother filed a notice of appeal from the November 21, 2007 order.

¶ 7 We have jurisdiction over Father's appeal pursuant to A.R.S. § 12–2101(C), (F) (2003). We discuss our jurisdiction over Mother's cross-appeal and her appeal from the November order below.

¶ 8 Father's appeal argues that the family court abused its discretion by: (1) attributing hypothetical childcare expenses to Mother; (2) erroneously computing Father's income; and (3) denying his request for fees.[1]

¶ 9 Mother raises a like number of issues in her cross-appeal, but she did not file a separate brief on her direct appeal. We first address the jurisdictional issues presented by Mother's cross-appeal and separate appeal.

## II. DISCUSSION

### A. Jurisdiction

¶ 10 We review *de novo* trial court rulings involving questions of pure law, including the court's jurisdiction to enter its orders of September 21, 2007 and November 21, 2007. See *Hall v. Lalli*, 194 Ariz. 54, 57, ¶ 5, 977 P.2d 776, 779 (1999). We also review independently our own jurisdiction over the parties' appeals.

### 1. Father's Premature Appeal

¶ 11 In *Barassi v. Matison*, 130 Ariz. 418, 419–20, 636 P.2d 1200, 1201–02 (1981), the supreme court held that a notice of appeal filed after the denial of a motion for new trial but before the entry of final judgment was sufficient to secure appellate jurisdiction. Because the lower court's substantive decision had become final, and only ministerial tasks remained to accomplish the entry of a final judgment, the court reasoned that dismissal of such a premature notice of appeal would "punish the appellant for being too diligent." *Id.* at 421, 636 P.2d at 1203. The court pointed out, however, that appellate courts lack jurisdiction when "a litigant attempts to appeal where a motion is still pending in the trial court or where there is no final judgment." *Id.* at 422, 636 P.2d at 1204; *see also Baumann v. Tuton*, 180 Ariz. 370, 373, 884 P.2d 256, 259 (App.1994) (concluding that appellate courts lack jurisdiction over an appeal that was filed while the appellant's time-extending motion was still pending in the lower court, and that such a premature notice of appeal is a "nullity").

---

1. Father's opening brief was filed while Mother's motion to strike the order ruling on Father's motion for new trial was still pending. The other issues Father sought to advance in this appeal are moot as a consequence of the trial court's ruling on the motion for new trial.

¶ 12 In *Performance Funding, LLC v. Barcon Corporation,* 197 Ariz. 286, 289, ¶¶ 10–13, 3 P.3d 1206, 1209 (App.2000), we held that a notice of appeal filed during the pendency of the *appellee's* time-extending motion was not jurisdictionally defective. *Performance Funding* interpreted *Baumann* narrowly—the court construed *Baumann* to mean simply that a premature notice of appeal did not operate to effect a withdrawal of the *appellant's own* motion for new trial. *Id.* at ¶ 10, 884 P.2d 256. *Performance Funding* also declined to follow as *dictum* the language in *Barassi* that warned that a notice of appeal filed during the pendency of a time-extending motion was insufficient to confer appellate jurisdiction. *Id.* at 288, ¶¶ 7–8, 3 P.3d at 1208.

¶ 13 If *Performance Funding* still controlled, we would conclude that the prematurity of Father's notice of appeal and Mother's notice of cross-appeal did not deprive us of jurisdiction. But in *Smith v. Arizona Citizens Clean Elections Commission,* the supreme court underscored its commitment to the more restrictive rule first expressed in *Barassi:* "[A]ppellate courts should dismiss a case for lack of jurisdiction while [a time-extending] motion was still pending in the trial court." 212 Ariz. 407, 415, ¶ 38, 132 P.3d 1187, 1195 (2006) (citing *Barassi,* 130 Ariz. at 422, 636 P.2d at 1204). *Smith* not only interpreted the *Barassi* exception to the final judgment rule as narrowly as possible, it read *Baumann* more broadly to defeat jurisdiction over an appeal commenced while a motion for new trial was pending. *Id.* at ¶¶ 37–39, 884 P.2d 256. In view of the supreme court's reprise of the cautionary language concerning time-extending motions in *Barassi,* we can no longer dismiss that language as mere *dictum.* Though *Smith* did not discuss *Performance Funding,* the court

concluded that outside the slim exception announced in *Barassi,* premature notices of appeal are ineffective because they disrupt the court process and prevent two courts from assuming jurisdiction and acting at the same time. *Id.* at ¶ 39, 636 P.2d 1200.

■ ¶ 14 Here, Father's initial appeal to this court was premature because he filed his notice while his own motion for new trial was still pending before the superior court. *Baumann,* 180 Ariz. at 372, 884 P.2d at 258. Under *Baumann,* Father's premature notice of appeal was a "nullity and did not constitute an abandonment of the pending motion for new trial." *Id.* at 373, 884 P.2d at 259; *see also Smith,* 212 Ariz. at 415, ¶ 39, 132 P.3d at 1195. We therefore conclude the family court retained jurisdiction to consider the motion for new trial. It is Father's October 9, 2007 supplemental notice of appeal following the signed minute entry disposing of the motion for new trial that confers jurisdiction on this court.

■ ¶ 15 In addition, the court correctly denied Mother's motion to strike its September order. Arizona Rule of Family Law Procedure ("ARFLP") 32(E) provides that a motion to strike is available to request that the court "order stricken from a *pleading* any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." (Emphasis added.) *Compare with* Ariz. R. Civ. P. 12(f). ARFLP 32(E) provides no basis for the court to strike its own order from the record.[2]

## 2. Mother's Premature Cross–Appeal

■ ¶ 16 We now consider this court's jurisdiction over the cross-appeal. For the same reasons we held that Father's first notice of appeal was premature, we also hold

2. We note that the use of "motions to strike" to challenge all manner of items in the record, though regrettably common in practice, should be avoided except when authorized by rule. Motions to strike are not properly used to voice objection to the content of a court order. "Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" *Waste Management Holdings, Inc. v. Gilmore,* 252 F.3d 316, 347 (4th Cir.2001) (quoting 5A A. Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1380, 647 (2d ed.1990)). The use of motions to strike beyond the narrow purpose articulated in the rules frequently has the consequence of impeding the efficient resolution of cases and increasing the cost of litigation. The proper procedural vehicle by which to challenge the court's order in this case would have been a motion for reconsideration, which would not have required a response and reply absent the court's permission. ARFLP 35(D).

that Mother's notice of cross-appeal was premature. But unlike Father, Mother never filed a supplemental notice of cross-appeal from the September 11 order nor made any other effort to revive the issues she raised in her premature cross-appeal. Because the notice of cross-appeal was premature and Mother did not file a supplemental notice to cure this defect, we cannot consider the cross-appeal. *See Smith*, 212 Ariz. at 415, ¶ 39, 132 P.3d at 1195; *Baumann*, 180 Ariz. at 372–73, 884 P.2d at 258–59.

¶ 17 We also cannot consider the issues raised in Mother's cross-appeal as cross-issues on appeal. In the absence of a cross-appeal, the appellee may raise a cross-issue in the answering brief only if the issue does not result in an enlargement of appellee's rights or a lessening of appellant's rights on appeal. ARCAP 13(b)(3) ("The appellate court may direct that the judgment be modified to enlarge the rights of the appellee or to lessen the rights of the appellant only if the appellee has cross-appealed seeking such relief."); *see also Davis v. Cessna Aircraft Corp.*, 182 Ariz. 26, 37, 893 P.2d 26, 37 (App.1994). The issues raised in Mother's cross-appeal all seek an enlargement of her rights and a lessening of Father's rights because she seeks to increase the child support amount and obtain an award of attorneys' fees. Accordingly, we conclude we do not have jurisdiction to consider Mother's arguments in her cross-appeal.

### 3. Mother's Direct Appeal

¶ 18 The November order from which Mother directly appeals was not signed by the family court judge as required by ARFLP 81. Ordinarily, this would require us to suspend the appeal to allow Mother to obtain a written, signed order corresponding to the minute entry order of November 23, 2007. *See Eaton Fruit Co. v. Calif. Spray–Chemical Co.*, 102 Ariz. 129, 426 P.2d 397 (1967). However, we must first address whether the November order was substantively appealable.

¶ 19 An appealable post-judgment order must satisfy two requirements. *Arvizu v. Fernandez*, 183 Ariz. 224, 226, 902 P.2d 830, 832 (1995). "First, the issues raised by the appeal from the order must be different from those that would arise from an appeal from the underlying judgment." *Id.* "The second requirement is that 'the order must either affect the judgment or relate to it by enforcing it or staying its execution.'" *Id.* at 227, 902 P.2d at 833 (quoting *Olson v. Cory*, 35 Cal.3d 390, 197 Cal.Rptr. 843, 673 P.2d 720 (1983)).

¶ 20 Applying the first requirement here, we conclude that the appeal from the November order does not raise any issue that could not have been raised in an appeal from the September order. *See Arvizu*, 183 Ariz. at 226, 902 P.2d at 832. The November order merely (1) denied Mother's motion to strike on the ground that it had jurisdiction to rule on the motion for new trial despite Father's premature appeal to this court; and (2) denied attorneys' fees. Because all of the substantive issues addressed in the November order were previously addressed in the September order, the first requirement of *Arvizu* has not been met.[3] Therefore, we conclude that the November order is not an appealable post-judgment order, and we lack jurisdiction over Mother's direct appeal.

### B. Attribution of Childcare Expenses

¶ 21 "Generally, we review child support awards for abuse of discretion." *McNutt v. McNutt*, 203 Ariz. 28, 30, ¶ 6, 49 P.3d 300, 302 (App.2002) (citing *Kelsey v. Kelsey*, 186 Ariz. 49, 53, 918 P.2d 1067, 1071 (App.1996)). Unless they are clearly erroneous, we accept the trial court's findings of fact; however, we "'draw our own legal conclusions from facts found or implied in the judgment.'" *Id.* (quoting *Burnette v. Bender*, 184 Ariz. 301, 304, 908 P.2d 1086, 1089 (App.1995)). We review *de novo* the trial court's interpretation of the Guidelines. *Clay v. Clay*, 208 Ariz. 200, 202, ¶ 5, 92 P.3d 426, 428 (App.2004).

¶ 22 Section 5(E) of the Guidelines implements the policy that both parents, re-

---

**3.** Because the first requirement is not satisfied, we do not consider the second.

gardless of their employment status, must provide appropriately for their children's reasonable needs. The section allows a court to attribute hypothetical income and expenses to protect a working parent from paying a disproportionate amount of the total support obligation when the other parent has chosen not to earn income to the extent he or she is able. *Id.; see also Little v. Little*, 193 Ariz. 518, 521, ¶ 6, 975 P.2d 108, 111 (1999).

¶ 23 Section 5(E) requires the court to consider the manner in which a parent's decision not to work (and the consequent reduction in income available for child support) will affect the children, and to weigh that impact against the benefits of the parent's choice. The benefits must be determined on a case-by-case basis, and the court may consider such factors as whether the decision is (1) designed to enhance future earning capacity; (2) places the children in financial peril; (3) allows a parent more needed time at home with his or her children; and (4) appropriate in view of the individual needs of a particular child.

¶ 24 After conducting the necessary balancing, the court may decide to attribute income to the voluntarily unemployed parent for purposes of the child support computation. *Id.* In addition, "[i]f income is attributed to the parent receiving child support, appropriate childcare expenses may also be attributed." *Id.* The intended effect of attribution of hypothetical income is typically to deny the unemployed parent the unilateral ability to effect a downward modification of his or her child support obligation (or to impose an enhanced obligation on the other parent) by choosing not to work. *See Little*, 193 Ariz. at 522, ¶¶ 12–13, 975 P.2d at 112.

¶ 25 The manner in which attribution of hypothetical income and expenses affects the parents' actual monthly support obligation merits examination. A child support calculation begins with the computation of the parents' combined adjusted gross income. Guidelines § 5. The Guidelines prescribe the specific Basic Child Support Obligation based upon income and the number of children entitled to support. *Id.* at § 8. After certain adjustments are made to the Basic Child Support Obligation, the Total Child Support Obligation is computed. *Id.* at § 9. The parents' Proportionate Shares of that amount are then determined by reference to income, certain expenses and parenting time as percentages. *Id.* at §§ 10–11. The Total Child Support Obligation is a combined obligation, shared by both parents according to their Proportionate Shares. *Id.* at § 10.

¶ 26 Voluntary reduction in income by one parent has two effects—it usually lowers the Basic Child Support Obligation available for the support of the children and also lowers the Proportionate Share of the Total Obligation that the parent is required to pay. The net effect, without any attribution of hypothetical income, is both to reduce the total amount of support contributed for the benefit of the children and increase the burden on the employed parent.

¶ 27 The importance of distinguishing between the effect of unemployment on the Total Support Obligation and the parents' Proportionate Shares is underscored in cases such as this, where one parent's income exceeds $20,000 per month. Because the total support prescribed by the Guidelines reaches its maximum when the *combined* income of the parents equals $20,000 per month, no change in Mother's income—up or down—would have had any effect on the total support allocated for the children. The only effect of a change in her income, real or attributed, would be to increase her Proportionate Share of responsibility for the total amount, with a resulting reduction in the amount Father is required to pay. And where, as here, Mother's increase in income is hypothetical, the net effect of attribution of income is that the *children* bear the burden of Father's reduced payment with no additional contribution by Mother.[4]

---

4. For example, if the working parent's income is $25,000 per month, and the other parent's income is $4,000 from spousal maintenance, the Basic Child Support Obligation is $2,039. Absent adjustments, the working parent would pay $1,712.76 per month under the 2005 guidelines.

If an additional $4,000 were attributed to the unemployed parent, the Basic Child Support Obligation remains the same but the working parent would pay only $1,476.52 despite the fact that the unemployed parent has no actual additional funds to contribute.

¶ 28 The problem created by attribution of income was compounded, however, when the court attributed $900 per month in hypothetical childcare expenses to Mother. Because the parties' combined income already exceeded the maximum recognized by the Guidelines, the attributed increase in income to Mother had no effect on the Basic Child Support Obligation. But the hypothetical childcare expenses increased the Total Child Support Obligation almost dollar for dollar. And because Father's proportionate share of the total support amount far exceeded Mother's, the net effect of the attribution was to significantly increase the amount that Father was required to pay. Therefore, instead of attenuating the effect on Father of Mother's unemployment, the entire process of attribution actually *amplified* the effect.[5] And while the court properly could have found that Mother's decision to remain at home was in the children's best interests, nothing in the Guidelines or in *Little* suggests that a parent should be able to use hypothetical attribution to transform a decision to remain unemployed into an increase in child support received.[6] Because we conclude that the attribution of income and childcare expenses worked a result contrary to that intended by the Guidelines, we reverse.[7]

### C. Father's Income

¶ 29 Father contends that the family court erred by aggregating the stock options he received in 2004, 2005, and 2006 to determine his income for 2007. We agree.

¶ 30 At trial, Father testified that the stock options he received from his employer vested over a two year period, and that the employer used a method known as "Black–Scholes" to project the value of those options. *See In re Marriage of Robinson and Thiel*, 201 Ariz. 328, 334, ¶ 14, 35 P.3d 89, 95 (App.2001)

(disapproving the Black–Scholes valuation method). Although Father did not argue that the court should use the Black–Scholes formula, he suggested that the court should treat his mature, unexercised vested stock options as liquid assets and attribute a five percent annual return to them. Father testified that his vested matured stocks were worth $1,147,000, and suggested that $57,350 should be added to his income for the purposes of determining his child support obligation.

¶ 31 Rejecting Father's method of valuing his stock options, the trial court adopted a valuation method used in an Ohio case, *Murray v. Murray*, 128 Ohio App.3d 662, 716 N.E.2d 288 (1999). It noted that this method of valuation had been approved by the Arizona courts in *Robinson*.

¶ 32 In *Robinson*, the court held that mature, vested stock options must be imputed as part of a parent's gross income. 201 Ariz. at 333, ¶ 12, 35 P.3d at 94. To hold otherwise, would "allow the parent 'to shield a significant portion of [the parent's] income from the courts, and deprive [the] children of the standard of living they would otherwise enjoy.'" *Id.* (quoting *Murray*, 128 Ohio App.3d at 669, 716 N.E.2d at 294). The Robinson court concluded that "vested, matured stock options must be valued independently of and without regard to the employee parent's decision to actually exercise them." *Id.* (citing *Fisher v. Fisher*, 564 Pa. 586, 769 A.2d 1165 (2001)).

¶ 33 The *Robinson* court declined to "adopt[ ] a universal method of valuing such options and [left] that to the trial court's discretion, based on the facts and circumstances of each case." *Id.* at 330, ¶ 1, 35 P.3d at 91. In *dictum*, the court chose not to "foreclose the trial court from adopting [the

---

5. Mother warned of this potential anomaly and did not seek this result.

6. When the court finds that voluntary unemployment is in the children's best interests, it may choose not to attribute income and thereby require the working parent to bear the burden of the unemployment. But it may not use attribution under § 5(E) to enhance that burden. Where circumstances require, deviation from the support prescribed by the Guidelines may be

accomplished pursuant to § 20, not through the fiction of attribution.

7. Father also contends that the family court abused its discretion by failing to annualize the cost of a nanny because the children attend summer camp for four weeks and would not need a nanny during that time. In view of our decision that the attribution of such costs cannot be squared with the Guidelines on these facts, this assignment of error is moot.

Murray approach] upon remand if the facts and circumstances warranted it." *Id.* at 334, ¶ 16, 35 P.3d at 95. *Robinson* further noted that "[t]he appropriateness of the valuation method will depend on such factors as the nature of the stock options, market conditions, tax consequences, ease of application, and other facts and circumstances peculiar to each case." *Id.*

¶ 34 The method employed by the Ohio court in *Murray* was to "account for the options' appreciation in value as determined on the grant and exercise dates of the options [that] fall into the income year at issue." 128 Ohio App.3d at 675, 716 N.E.2d at 298. Under this approach, each option grant is valued on the most recent dates for which an option could be exercised minus the price on the date the option was granted. *Id.* "A shorthand method of doing this calculation is to add together the total number of unexercised shares from all the options, and multiply this number by the stock price increase for the income year at issue." *Id.* at 676, 716 N.E.2d at 299.

¶ 35 In this case, the family court adopted the *Murray* method and found that Father had 20,020 vested, unexercised shares of General Dynamic stock, which had been granted to him in 2004, 2005, and 2006. The court multiplied 20,020 by the price per share increase ($13.88) that had occurred in 2006, and concluded that the value of the appreciation of these unexercised stock options was $277,877 during 2006. The court added that figure to Father's annual income.[8]

¶ 36 Father argues that this method of valuation constituted an abuse of discretion because it used three years of option awards to calculate one year of income. In its ruling on Father's motion for new trial, the family court declined to consider Father's arguments because his "legal argument . . . was never raised at trial." During trial, Father proposed a method of valuing his stock options that the family court rejected. The trial court adopted the *Murray* method *sua sponte.* Because Father could not reasonably have anticipated the court's ruling,

we conclude that his arguments were entitled to consideration.

¶ 37 In addition to its conclusion that Father waived his challenge, the family court explained that the alternative methods presented in the motion for new trial were contrary to *Robinson:*

Moreover, the suggested alternate ways of valuing vested but unexercised stock options as income—imputing an estimated investment return and/or considering as income only the appreciation in value of one year of stock options—both appear to ignore the issue addressed in *Robinson:* the fact that vested but unexercised stock options, as a component of compensation, have some value as income each year until exercised.

¶ 38 While we agree that vested but unexercised stock options have some value as income, the critical question is whether the *Murray* method is "consistent with the policies and purposes of the Guidelines." *See Robinson,* 201 Ariz. at 334, ¶ 16, 35 P.3d at 95. The overarching purpose of the Guidelines is to establish "a standard of support for children consistent with their needs and the ability of parents to pay, and to make child support awards consistent for persons in similar circumstances." *Cummings v. Cummings,* 182 Ariz. 383, 385, 897 P.2d 685, 687 (1994) (citing Guidelines § 1 (1992)); *see also Little,* 193 Ariz. at 520, ¶ 4, 975 P.2d at 110. The paramount factor a trial court must consider when applying the Guidelines is the best interest of the child. *See Little,* 193 Ariz. at 522, ¶ 12, 975 P.2d at 112.

¶ 39 The inherent problem with the *Murray* method is that it makes the interest of the child dependent on market fluctuations that have no actual effect on the funds available to support the children. Child support obligations should not be governed by the volatility of the marketplace, and the implicit assumption in Murray that options will appreciate year to year does not comport with the realities of the market. Moreover, the *Murray* approach may lead to an unfair calculation of income based upon the actual

---

8. This calculation of income did not include restricted shares of General Dynamics stock be- cause the holding period had not ended for any restricted shares granted to Father.

present value of years of accumulated wealth, rather than the rate of return properly attributed to such wealth.

¶ 40 Valuation of unexercised, vested, matured stock options must be performed on a case-by-case basis. We agree that the amount of child support should not be subject to the "investment decisions or whims of the employee parent." *Robinson,* 201 Ariz. at 333, ¶ 12, 35 P.3d at 94. But we disagree with the *dictum* in *Robinson* that allowed for the inclusion in income of the unrealized present market value of stock options earned years before.

¶ 41 Though we do not require trial courts to follow any single valuation method, one approach that serves the purposes of the Guidelines and reflects economic reality is to examine the value the parties placed on the stock options when they entered into their employment compensation agreement. In this case, the parties' agreement is readily found in Father's Executive Compensation Summary report. That report contains a summary of Father's executive compensation package, including his base salary, his bonus, and his stock option awards. The report, though not conclusive, purports to represent the amount that both Father and his company thought was a fair value of Father's work during the year at issue. The report used the Black–Scholes method to project the value of the stock over a five year period. And while the calculation is not revealed in the report, it is not the calculation itself that is relevant—it is the fact that the employer and employee agreed to its result, and an arm's length agreement is admissible evidence of the actual value of the options granted in the year at issue.[9] By making this observation, however, we do not constrain the ability of the trial courts to consider all admissible evidence, including expert testimony.

¶ 42 As noted in *Robinson,* there are "numerous methods available for valuing employee stock options." 201 Ariz. at 334, ¶ 16, 35 P.3d at 95. The court is not required to use a company's projections to determine the

value of the stock options. It should, instead, select a valuation method based on the evidence presented at trial that accounts for "the nature of the stock options, market conditions, tax consequences, ease of applications, and other facts and circumstances peculiar to each case." *Id.* After determining the value of the options, the court has wide discretion in selecting a reasonable rate of return that accounts for all relevant factors, including a parent's decision not to exercise mature options.

¶ 43 We therefore reverse the court's determination of the stock option component of Father's income and remand for recalculation of child support consistent with today's holding.

### D. Father's Attorneys' Fees at Trial

¶ 44 Father also argues that the family court abused its discretion by not awarding his reasonable attorneys' fees at trial. Mother argues that the court's ruling on the motion for new trial was unjustified and that Father should pay her attorneys' fees. Mother, however, cannot raise this as a cross-issue on appeal because ruling in her favor would expand her rights by awarding her attorneys' fees. *See* ARCAP 13(b)(3).

¶ 45 We will not disturb the family court's decision regarding attorneys' fees absent an abuse of discretion. *Gutierrez v. Gutierrez,* 193 Ariz. 343, 351, ¶ 32, 972 P.2d 676, 684 (App.1998). The court may consider the parties' settlement positions in determining reasonableness under A.R.S. § 25–324. *Id.* at ¶ 34, 972 P.2d 676.

¶ 46 The family court's findings indicate that both parties took reasonable and unreasonable positions at times on various issues. The record supports these findings. In addition, neither party appeared inclined to settle this matter. We find no abuse of discretion in denying Father's request for attorneys' fees.

9. In *Robinson,* we "question[ed] the practicality of these models" for use in litigation. 201 Ariz. at 334, ¶ 14, 35 P.3d at 95. Though the concern with the use of Black–Scholes purely as a litiga-

tion tool remains, that concern is satisfied when the parties to a contract choose to use the method in a commercial context.

## E. Attorneys' Fees on Appeal

¶ 47 Both parties request an award of attorneys' fees. In our discretion, we decline to award attorneys' fees on appeal.

## IV. CONCLUSION

¶ 48 For the foregoing reasons, we vacate the family court's rulings concerning the parties' income and Mother's attributed childcare costs. We reverse the court's ruling that Father waived his right to review of the calculation of income from stock options and remand for a recalculation of his income and child support in accordance with today's holdings. Further, we hold that we do not have jurisdiction to consider the issues raised in Mother's direct appeal of the November orders or her cross-appeal. In all other respects, we affirm the family court's rulings.

CONCURRING: MICHAEL J. BROWN, Presiding Judge and DANIEL A. BARKER, Judge.