NOTICE: NOT FOR PUBLICATION.
UNDER ARIZ. R. SUP. CT. 111(c), THIS DECISION DOES NOT CREATE LEGAL PRECEDENT
AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In re the Marriage of:

KAREN TOMORY PACHTMAN, *Petitioner/Appellant*,

*v.*

MICHAEL ARTHUR PACHTMAN, *Respondent/Appellee*.

No. 1 CA-CV 12-0678
FILED 08-19-2014

Appeal from the Superior Court in Maricopa County
No. FN2010-093843
The Honorable Benjamin R. Norris, Judge

**AFFIRMED IN PART, VACATED IN PART, REMANDED**

COUNSEL

Law Offices of Robert E. Siesco Jr., Phoenix
By Robert E. Siesco

Law Office of Gregory E. Hinkel, Glendale
By Gregory E. Hinkel
*Co-Counsel for Petitioner/Appellant*

Dickenson Wright, PLLC, Phoenix
By Robert L. Schwartz, Anne L. Tiffen
*Counsel for Respondent/Appellee*

---

## MEMORANDUM DECISION

Presiding Judge Maurice Portley delivered the decision of the Court, in which Judge John C. Gemmill and Judge Kent E. Cattani joined.

---

**P O R T L E Y,** Judge:

¶1        Karen Tomory Pachtman ("Wife") challenges various rulings leading to the decree of dissolution, as well as the award of attorneys' fees to Michael Arthur Pachtman ("Husband").   Based on the following, we affirm in part, vacate in part, and remand this matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2        Shortly before their marriage in December 2003, the parties entered into a Prenuptial Property Agreement ("PPA").  Some five years later, and after negotiations, they entered into a Memorandum of Understanding ("MOU"), and Husband then transferred various sole and separate business assets to the community.

¶3        The parties separated in December 2010, and Wife filed her petition for dissolution in February 2011.  The case proceeded to trial.  After considering the evidence, the family court filed its ruling and issued a decree of dissolution in April 2012.  Wife filed a motion for reconsideration and to alter or amend the decree, which was only granted in part, as well as an unsuccessful motion for new trial and for amended or supplemental findings of fact.  The court granted Husband his attorneys' fees and costs and subsequently awarded him additional fees to encompass his response to the motion for new trial.  This appeal followed.

## DISCUSSION

¶4        Wife contends that the family court erred in its construction of the PPA and MOU.  We review the court's interpretation of the agreements de novo. *Rand v. Porsche Fin. Servs.*, 216 Ariz. 424, 434, ¶ 37, 167 P.3d 111, 121 (App. 2007) ("The interpretation of a contract is a question of law, which we review de novo.")  When reviewing a contract, it "must be read as a whole in order to give a reasonable and harmonious meaning and effect to all of its provisions." *Nichols v. State Farm Fire & Cas. Co.*, 175 Ariz. 354, 356, 857 P.2d 406, 408 (App. 1993) (citation omitted) (internal quotation

marks omitted). We also interpret contracts according to their plain and ordinary meaning, and if unambiguous, we will not create ambiguity to benefit one party to the detriment of another. *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46, ¶ 11, 13 P.3d 785, 788 (App. 2000). "The purpose of contract interpretation is to determine the parties' intent and enforce that intent. . . . [W]hether a contract is reasonably susceptible to more than one interpretation is a question of law, which we review de novo." *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, ¶ 9, 218 P.3d 1045, 1050 (App. 2009). The parties' intent is a question of fact for the fact finder and we will not reverse the fact finder's determination unless it is clearly erroneous. *Chopin v. Chopin,* 224 Ariz. 425, 428, ¶ 7, 232 P.3d 99, 102 (App. 2010); *see Harrington v. Pulte Home Corp.*, 211 Ariz. 241, 246-47, ¶ 16, 119 P.3d 1044, 1049-50 (App. 2005) ("We must defer, absent clear error, to the factual findings upon which the trial court's conclusions are based.").

¶5        During the trial, the family court had to construe the PPA and MOU. The court determined that it had to construe both agreements together to resolve three disputed issues: (1) what length of time was Wife to receive $6,000 per month as spousal maintenance; (2) when was Husband obligated to start depositing funds into the joint account for temporary support, how much was he to deposit and was Wife entitled to half of all the funds deposited into the account during the applicable time period; and (3) what, if any, "additional spousal maintenance" was Husband obligated to pay Wife for transferring her interest in a community-held company to Husband.

## I.       Duration of Spousal Maintenance

¶6        The parties agreed that the PPA required Husband to pay Wife $6,000 a month as spousal maintenance. They disagree, however, about the length of Husband's obligation to pay spousal maintenance.

¶7        PPA ¶ 5.7(D) provides that Wife would receive spousal maintenance "upon the entry of a decree of dissolution with a property settlement being adjudicated . . . ." The parties disagree about the meaning of another sentence in the paragraph that states: "[t]hat monthly spousal maintenance amount shall continue so long as [Wife] is living, until the earlier of the following events: (a) a date which follows *the dissolution date* by one-half of the number of months that the parties were married, or (b) [Wife's] remarriage." (Emphasis added.) The dispute, as a result, is over the term "dissolution date."

¶8            Under the PPA, the use of the term "dissolution date" would be given its customary meaning of the date of the decree of dissolution; especially considering that the initial sentence of subparagraph D discusses "upon the entry of a decree of dissolution with a property settlement being adjudicated as well."  *See* Ariz. Rev. Stat. ("A.R.S.") § 25-325(A) ("A decree of dissolution of marriage . . . is final when entered.").

¶9            The issue was, however, complicated by a pretrial ruling. Before trial, the family court had to resolve whether Wife was only entitled to spousal maintenance under the MOU or whether she would get spousal maintenance in the PPA and additional spousal maintenance under the MOU.  The court determined that the PPA and MOU had to be read together, that if there was any ambiguity the MOU controlled, that Wife was entitled to spousal maintenance under the PPA and additional spousal maintenance under the MOU, and the additional spousal maintenance would be "retroactive to the date of the [d]issolution [e]vent."

¶10           Husband then used the ruling to argue at trial that the family court should apply the defined "dissolution event" in MOU ¶ 2(m), to the term "dissolution date" in PPA ¶ 5.7(D).  Despite the fact that the pretrial motion and the trial issue were different, the family court adopted Husband's position, and determined that the "dissolution date" was the date the petition for dissolution was filed and not the entry of the decree.  As a result, the court concluded that the parties were married for 85 months instead of 99 months.

¶11           Here, the family court did not need to look to the MOU generally or specifically to MOU ¶ 2(m) to determine the meaning of the "dissolution date" in PPA ¶ 5.7(D) because the meaning of the phrase may be determined within the four corners of the PPA.  Although the PPA spousal maintenance provision does not specifically define "dissolution date," *see* PPA ¶ 5.7(D)(3), the introductory sentence of PPA ¶ 5.7(D) clearly states that Wife's spousal maintenance shall begin upon entry of a decree. The provision is consistent with A.R.S. § 25-325(A) that provides a decree of dissolution is final when entered by the court.  As a result, the intent of the parties in the PPA is clear – Wife would get spousal maintenance upon entry of a dissolution decree.

¶12           Moreover, our interpretation of the term is also supported by the PPA temporary support provision.  PPA ¶ 5.7(C) provides that the temporary support through the joint account ends on the date of a decree, which is also the date that permanent support begins pursuant to PPA ¶ 5(D).  The mechanism in the PPA that the parties agreed to is similar to a

typical divorce where there is initially temporary support and the final spousal maintenance for whatever period of time begins with the entry of the divorce decree.

**¶13**        In addition, because the MOU obligations were unrelated to the original and separate spousal maintenance obligation in the PPA, the PPA did not need to be read in conjunction with the MOU. MOU ¶ 13 specifically provides that the MOU controlled over the PPA only "[i]n the event of any conflict between the provisions." Furthermore, Restatement (Second) of Contracts § 213 (1981) states that "[a] binding integrated agreement discharges prior agreements to the extent that it is *inconsistent* with them." (Emphasis added.)

**¶14**        Here, the family court interpreted the PPA in light of MOU ¶ 2(m) and found that the "dissolution event" was the date the petition of dissolution was filed. However, unlike the PPA, MOU ¶ 2(m) did not discuss spousal maintenance, but only the additional spousal maintenance Wife was entitled to if she transferred her interest in a community-held company to Husband. Consequently, the family court misinterpreted the PPA term "dissolution date."[1]

**¶15**        Because we have found interpretative error, we vacate the portion of the decree limiting spousal maintenance to 42.5 months, which was calculated as one-half the duration of the marriage. We remand the issue to the family court and direct the court to modify the spousal maintenance order to provide that the parties were married from December 20, 2003 to April 9, 2012,[2] and Wife, as a result, is entitled to 49.5 months of spousal maintenance under PPA ¶ 5.7(D)(3).

---

[1] Because, as the court found, the two documents were prepared at different times and for different purposes, there was nothing in the MOU that suggested it was modifying the PPA spousal maintenance provision as required by PPA ¶ 10.1. *Cf. Childress Buick Co. v. O'Connell*, 198 Ariz. 454, 456, ¶¶ 9-10, 11 P.3d 413, 415 (App. 2000) (finding that two agreements were not "separate and sequential contracts," but "contemporaneous documents . . . to be read together to determine the nature of the transaction").

[2] We refer to the date the decree was filed with the Clerk of the Court. *See* Ariz. R. Fam. L.P. 81(A) ("The filing with the clerk of the judgment constitutes entry of such judgment.").

## II.     Joint Account

¶16         The parties created a mechanism in the PPA for temporary support in the event of separation or divorce.  PPA ¶ 5.7(C) provided that either party could use the joint account to pay living expenses.  A related provision, PPA ¶ 4.3, provided that the parties had set up a joint account "for the deposit of funds to pay certain expenses, including by way of example, but not limited to, utility expenses, living expenses, travel expenses, food expenses and community property debts."  Husband was obligated to fund the joint account to the same level as the twenty-four months prior to the couple separating or filing of a petition for dissolution of marriage.  *See* PPA ¶ 5.7(C).  And, the parties agreed that the following items listed in ¶ 5.7(A) were expressly excluded from determining the prior twenty-four month funding level: "any gifts of separate property, or any transmutation or conversion of separate property into community property, or any payments of community debt with separate property funds (other than any such payments for the regular mortgage payments for the parties['] joint residences)."

¶17         At trial, Wife argued that the twenty-four month funding history included deposits from various community medical practices and other business entities.  According to Wife's calculations, the average deposits over the last twenty-four months were $216,340.92 per month.  As a result, Wife argued she was entitled to receive half the amount deposited in the joint account each month since the parties separated on December 19, 2010.

¶18         The parties, however, stipulated in June 2011 that Husband would deposit $45,000 each month into the joint account.  Husband argues the stipulation bars Wife from making any additional claims for temporary support.  He also argues that the PPA did not intend the twenty-four month average to include business deposits into the joint account.

¶19         The family court initially concluded that Husband's obligation to fund the joint account began when the parties separated in December 2010, and continued until the entry of a decree.  The court, however, declined to include deposits from the community businesses that were made to cover business expenses that were paid for out of the joint account, but instead held that Husband was bound by his stipulation to deposit $45,000 a month from the joint account from December 2010 until the entry of the decree.  Following the order, the parties continued to seek clarification as to when Husband's obligation began.  The parties attached different meaning to the court's order stating that Husband was bound by

the stipulation to deposit $45,000 into the joint account beginning June 1, 2011. The court subsequently ruled that Husband's obligation to fund the joint account was *completely* satisfied by paying Wife $22,500 from June 1, 2011 through April 6, 2012.

### A.    Duration of Obligation to Fund Joint Account

**¶20**        As a threshold matter, we resolve the issue of when Husband's obligation to fund the joint account began because the family court left the parties with conflicting rulings. Here, in the under advisement ruling, the family court stated that Husband's obligation to fund the joint account began on the date of separation — December 19, 2010. In fact, at the March 26, 2012 hearing, Husband's attorney conceded that Husband was ordered to fund the joint account beginning December 19, 2010. In ruling on a motion for clarification, however, the court stated that the obligation to fund the joint account was satisfied by Husband's payments from June 2011 to April 2012.[3]

**¶21**        The family court's initial ruling controls. PPA ¶ 5.7(C) states that the obligation to fund the joint account begins upon the parties' separation. The court and both parties accepted the position until later in the proceedings. The ruling is consistent with the purpose of PPA ¶ 5.7(C), which was to provide temporary support to pay living expenses during the pendency of the divorce proceedings. Consequently, the obligation to create and fund the joint account began when the parties separated on December 19, 2010.

### B.    Amount of Funding Obligation

**¶22**        The family court found that the parties stipulated that Husband was obligated to deposit $45,000 per month into the joint account. We agree.[4]

---

[3] We note that the decree states that Husband's obligation began on "December 18/19, *2011*." (Emphasis added.) Even assuming a clerical error, the court can make the correction on remand.

[4] Wife only challenged the effect of the parties' stipulation in her reply brief. We will not consider issues or explanations raised for the first time in the reply brief. *Muchesko v. Muchesko,* 191 Ariz. 265, 268, 955 P.2d 21, 24 (App. 1997).

¶23          Although Wife argues that the amount she should have had access to in the joint account should include business deposits Husband made, her argument is inconsistent with the purpose of the PPA. Paragraph 5.7(C) of the PPA states that the joint account is for the parties to use to pay for their living expenses. The family court heard testimony that the community businesses would make deposits into the joint account and the parties then would pay the businesses' expenses from that account in order to take advantage of substantial credit card rebates. Given the purpose of the joint account under the PPA and the benefit of getting credit card rebates, it would otherwise be inequitable and inconsistent with the purpose of the PPA to compensate Wife for business deposits that were not made to pay living expenses for the parties on a temporary basis.[5]

¶24          Although Wife contends that the purpose of the joint account support provision was not limited to paying the parties' living expenses, she does not offer an alternative purpose that is stated within the PPA. Moreover, Wife does not explain how the community business expenses, which had been historically paid from the joint account, would be paid if she were entitled to withdraw one-half the business deposits.

¶25          Wife also contends that she was entitled to whatever surplus was remaining in the joint account. Husband did not address that argument. The issue was not in the parties' joint pretrial statement, and Wife did not raise it until her motion for new trial. Accordingly, we decline to address the issue that was not presented to the family court in a timely manner. *See Conant v. Whitney,* 190 Ariz. 290, 293, 947 P.2d 864, 867 (App. 1997).

¶26          The family court did not adopt the correct date for the creation and funding of the joint account. Accordingly, we remand the matter to the family court and direct it to modify its order to state that Husband pay Wife $22,500 for the period from the date of separation, December 19, 2010, until the entry of the decree, April 9, 2012.

## III.    Valuation of Wife's Interests in Harbor Heights

¶27          Wife argues that the court erred in its determination of the value of her interest in Harbor Heights ("HH"), a holding company that

---

[5] Given our resolution, we need not address Husband's arguments that the business deposits were one of the expressly excluded items under PPA ¶ 5.7(A) or that inclusion would be unconscionable.

owns various businesses and assets. We will affirm the family court's "factual findings unless clearly erroneous or unsupported by any credible evidence." *Valento v. Valento*, 225 Ariz. 477, 481, ¶ 11, 240 P.3d 1239, 1243 (App. 2010). "'The valuation of assets is a factual determination that must be based on the facts and circumstances of each case.'" *Walsh v. Walsh*, 230 Ariz. 486, 490, ¶ 9, 286 P.3d 1095, 1099 (App. 2012) (quoting *Kelsey v. Kelsey,* 186 Ariz. 49, 51, 918 P.2d 1067, 1069 (App. 1996)).

¶28　　　　During the marriage, the parties jointly owned HH. HH is managed by a general partner, an entity called Dharma, which the parties also jointly owned. Upon dissolution, Wife was to receive "additional spousal maintenance" in return for transferring her interests in HH to Husband for one dollar. *See* MOU ¶ 2(m)(1). The family court, however, had to determine the amount of "additional spousal maintenance" Wife would receive based on the value of her interest in HH. *Id.* In effect, Wife receives a form of annuity payment in exchange for transferring her interest in HH to Husband.

¶29　　　　MOU ¶ 2(m)(3) states that the parties would appoint an appraiser whose valuation would be "binding and conclusive upon the parties." The appraiser presented the family court with two alternative valuations, a fair market value of $5,826,000 and an investment value of $7,277,000. He explained that the difference related to one item: an indemnity clause applicable to Wife. The clause indemnified Wife from a three million dollar community debt, and, therefore, had a value of $1.5 million. The appraiser testified that the indemnification value was factored out of the fair market value because Wife would retain the indemnification after she transferred her interest in HH. The family court adopted the fair market valuation because Wife retained the indemnification protection. The court stated that:

> [I]t would be unfair to include the value of these indemnifications in the value of HH for purposes of determining what Wife is giving up by conveying her interest in HH to Husband. If the Court were to adopt the investment valuation approach, Wife would receive both (a) the indemnifications themselves, and (b) Husband also effectively would have [to] pay Wife for ½ the value of these indemnifications, even though Wife is not giving them up. Accordingly, the Court adopts the fair market valuation approach, since it more accurately

reflects the value of what Wife is actually giving up in surrendering her interest in HH to Husband.

¶30        Wife contends the appraiser's investment value was conclusive and binding. Contrary to Wife's assertions, the appraiser did not state that the investment value was the only applicable standard. The MOU did not limit the appraiser to using one form of valuation. The appraiser testified regarding the two valuations and explained the difference. The court, after hearing the testimony and argument, chose the fair market value of HH. The court's determination to use the fair market value, as a result, was not clearly erroneous.

## IV.    Harbor Heights Distributions

¶31        MOU ¶ 2(i) states that "during and throughout their marriage" HH will make distributions to cover the parties' living expenses and current federal and state tax obligations. Wife contends that this distribution obligation did not end until the date the decree was entered in April 2012. The family court, however, applied its prior ruling that February 3, 2011, the filing date of the petition, was the "dissolution date" and concluded that HH distributions ended on that date because Wife was required to sign over her interests in HH within thirty days of that dissolution date. The court also reasoned that any cash assets of HH that would pay these obligations for Wife were included in the December 31, 2010 valuation of HH, and Wife would receive the benefit of that increased valuation because her "additional spousal maintenance" was tied to the value of HH.

¶32        Wife argues that the order interpreting the "dissolution date" for purposes of MOU ¶ 2(m) has no bearing on the interpretation of other provisions in the MOU. Wife contends she was entitled to distributions from HH until the date the decree was entered. Reading MOU ¶ 2(i) alone would support Wife's position that HH distributions for tax payments would continue "throughout the marriage," which, according to A.R.S. § 25-325(A), lasts until entry of the decree. However, the parties' rights and obligations regarding HH are also addressed in MOU ¶ 2(m). As a result, paragraphs 2(i) and 2(m) should be read together to determine the intent of the parties to their contract. *See Brisco v. Meritplan Ins. Co.,* 132 Ariz. 72, 76, 643 P.2d 1042, 1046 (App. 1982) ("We must read each section of the agreement in relationship to each other, to bring harmony, if possible, between all parts of the writing.").

¶33　　　　As the family court noted, there is "contradictory and confusing language" in MOU ¶ 2(m). Moreover, MOU ¶ 2(m) conflicts with the language of MOU ¶ 2(i), which provides that HH distributions will continue throughout the marriage. However, MOU ¶ 2(m)(6) states: "Effective as of the Dissolution Date, [Wife] shall no longer have any of the rights or powers of a member of Dharma or a partner of [HH], *including, but not limited to, the right to any distributions therefrom.*" (Emphasis added.)

¶34　　　　The family court properly determined the intent of the MOU provisions. Wife was required to turn over her interest in HH and was compensated by receiving "additional spousal maintenance" based on the value of HH. The value of HH was determined as of December 31, 2010, and included HH's cash assets. Because HH became Husband's separate property on February 3, 2011, Wife was not entitled to receive distributions from HH after February 2, 2011.

¶35　　　　Additionally, it is reasonable to ascribe the same meaning to the term "dissolution date" when it appears in more than one place in the same document. The interpretation best reconciles the MOU's inconsistent and confusing language. As a result, we affirm the order that Wife is not entitled to distributions from HH after February 3, 2011.[6]

## V.　　Termination of Additional Spousal Maintenance Obligation

¶36　　　　Wife argues the family court erred in concluding that the additional spousal maintenance payments provided in the MOU would terminate on Husband's death or her remarriage. Husband contends that the provision is governed by § 25-327(B) and therefore the spousal maintenance must end upon Husband's death or Wife's remarriage. *See* A.R.S. § 25-327(B) ("Unless otherwise agreed in writing or expressly provided in the decree, the obligation to pay future maintenance is terminated on the death of either party or the remarriage of the party receiving maintenance."); *see also Palmer v. Palmer,* 217 Ariz. 67, 73, ¶ 23, 170

---

[6] The court denied Wife any distributions from HH toward her 2010 to 2011 income tax returns. MOU ¶ 2(i) directs HH to pay the community's income tax liability "during and throughout their marriage." In contrast, MOU ¶ 2(m) addresses Wife additional spousal support for the transfer of her interest in HH "[i]n the event of a divorce, legal separation or other dissolution of the marriage". Because the two provisions address separate events, we remand to the family court to consider whether Wife is entitled to payment of any community tax liabilities for the time period up to February 3, 2011.

P.3d 676, 682 (App. 2007) (finding that spousal maintenance terminated upon remarriage because the decree did not "explicitly address remarriage . . . [or] provide that Husband shall have a continued obligation to make spousal maintenance payments notwithstanding Wife's remarriage"); *Diefenbach v. Holmberg,* 200 Ariz. 415, 418, ¶ 11, 26 P.3d 1186, 1189 (App. 2001) (holding language regarding non-modifiability is ineffective to prevent termination on death of recipient absent express language regarding termination).

¶37 Again, we must consider what the parties intended by the MOU. *See Grosvenor,* 222 Ariz. at 593, ¶ 9, 218 P.3d at 1050. Paragraph 2(m)(1) of the MOU states that in exchange for Wife transferring her interest in HH to Husband, Husband will pay Wife additional spousal maintenance "for the rest of her life." Moreover, MOU ¶ 2(m)(7) provides that the additional spousal maintenance payments "shall be non-modifiable, except in the event of [Wife's] death (in which event they shall terminate), and for no other reason in accordance with A.R.S. []§ 25-319(C)." The family court found that the parties intended this provision to compensate Wife for transferring her interest in HH in the form of an annuity payment. The language of MOU ¶ 2(m) supports this interpretation.

¶38 Given the purpose of the additional spousal maintenance payments, we conclude that the payments were not technically spousal maintenance, but a form of property settlement. *See Steiner v. Steiner,* 179 Ariz. 606, 611-12, 880 P.2d 1152, 1157-58 (App. 1994) (holding that whether an obligation is in the nature of spousal support or a form of property settlement depends on the intent of the parties at the time of the agreement). Therefore, § 25-327 did not apply and the court appropriately concluded that the parties did not intend the obligation to survive Husband's death because there was no provision expressly stating that intent and no provision for life insurance to guarantee that Wife would receive some minimal amount for the property distribution, despite the fact that the parties heavily negotiated the MOU.

¶39 Wife testified that because of the parties' age difference, both attorneys agreed that the additional spousal maintenance would last for Wife's lifetime. Husband, however, testified that the additional spousal maintenance under the MOU ended upon his death. He also testified that there was no provision that required that he obtain life insurance to pay the additional spousal maintenance should he predecease Wife, as was required for the spousal maintenance obligation under the PPA. Based on the MOU and the testimony, the court did not clearly err in determining

that the parties did not intend that the additional spousal maintenance obligation would survive Husband's death.

¶40        We disagree, however, that the parties intended the obligation to terminate upon Wife's remarriage.  At trial, Husband never took the position that this obligation terminated upon Wife's remarriage.  His trial brief only argued that the additional spousal maintenance obligation did not survive his death.  There was no testimony regarding the parties' intent should Wife remarry.  Thus, we must look exclusively to the contract language.  The MOU states that Wife would receive additional spousal maintenance for the rest of her life and that it would terminate for no other reason than Wife's death.  *See* MOU ¶¶ 2(m)(1), 2(m)(7).  The two provisions do not suggest that the parties intended to terminate the obligation upon Wife's remarriage.  The omission of a remarriage limitation indicates the parties intentionally left out a provision terminating the obligation on Wife's remarriage.  As a result, the finding that the additional spousal maintenance under the MOU terminates upon Wife's remarriage was error and is vacated.

## VI.    Mortgage Payments on Marital House

¶41        The court ordered Wife to reimburse Husband for the mortgage payments he had made on the marital house because Wife was living in the house or was permitted to live in the house during the months Husband made the mortgage payments.  Wife contends this was an error of law because she had invoked her rights under the anti-deficiency statutes and was, therefore, allowed to avoid paying the mortgage.  Wife also argues that Husband voluntarily made these mortgage payments after they decided to let the house go into foreclosure, so he should be responsible for the payments.[7]

¶42        The issue involves the division of a community obligation, which we review for an abuse of discretion.  *See Valento,* 225 Ariz. at 481, ¶ 11, 240 P.3d at 1243.  We agree with the family court that the anti-deficiency statutes did not preclude the court from ordering Wife to repay Husband for the mortgage payments.  The anti-deficiency statutes protect the parties from judgments in favor of creditors.  *See* A.R.S. §§ 33-729, -814.

---

[7] Husband argues that Wife waived the argument regarding her anti-deficiency rights by failing to make this argument at trial.  However, attorneys for both parties mentioned that they intended to take advantage of the anti-deficiency statutes and let the marital house go into foreclosure.

The statutes do not preclude the court from allocating the burden of past mortgage payments between two spouses in a divorce action. Moreover, the court considered the testimony of the parties. Specifically, the court accepted Husband's testimony that he opted to pay five months of past-due payments in order to obtain interim refinancing on a $16 million commercial property loan. Husband testified that because Wife delayed transferring her interest in HH, the lender would not provide the interim refinancing unless Wife was no longer on the property or the loan was current. Although Wife challenges the fact that her delay in transferring her interest in HH was the sole reason Husband had to obtain the interim financing, she offered no contrary evidence. Additionally, the court also concluded that because Wife had exclusive access to the house for most of the contested five months, the parties were ordered to share the mortgage obligation equally. Based on the record, we find no abuse of discretion.

## VII. Attorneys' Fees Awards

¶43 Wife argues that the family court erred by awarding Husband attorneys' fees and costs and denying her request for attorneys' fees at trial. We review the grant or denial of attorneys' fees for an abuse of discretion. *See Engel v. Landman*, 221 Ariz. 504, 514, ¶ 45, 212 P.3d 842, 852 (App. 2009); *In re Marriage of Robinson & Thiel,* 201 Ariz. 328, 335, ¶ 20, 35 P.3d 89, 96 (App. 2001).

¶44 In the post-trial ruling entitled "Under Advisement Ruling," the family court made several rulings regarding attorneys' fees. In the provision addressing an award of attorneys' fees and costs, the court ordered each party to bear his or her own fees and expenses because both parties took unreasonable positions throughout the proceedings and both had substantial financial resources. However, in a subsequent section addressing other reimbursements owed by Wife to Husband, the family court awarded Husband approximately $34,000 for fees and expenses he incurred as a result of Wife filing order of protection ("OOP") pleadings and raising criminal charges for alleged computer fraud. The court also awarded Husband $12,500 in attorneys' fees as a result of Wife's motion for new trial.

### A. Findings of Fact

¶45 Wife argues that despite her requests, the family court failed to make adequate findings of fact in the under advisement ruling regarding its denial of her request for attorneys' fees and costs. Section 25-324(A) provides that "the court shall make specific findings concerning the

portions of any award of fees and expenses that are based on consideration of financial resources and that are based on consideration of reasonableness of positions." A.R.S. § 25-324(A). The findings of fact are intended "to enable the appellate court to examine the basis on which the . . . court reached its ultimate judgment." *Reed v. Reed,* 154 Ariz. 101, 103, 740 P.2d 963, 965 (App. 1987).

¶46 Here, the court's findings satisfy the statutory requirements. For example, the ruling noted that Wife was entitled to spousal maintenance under the PPA and additional monies of $130,650 annually under the MOU. Additionally, the court found that Wife acted improperly in securing an OOP and attempting to have Husband charged with criminally intercepting her private email correspondence. Thus, the ruling made sufficient findings in regards to both factors. *See Miller v. Bd. of Supervisors of Pinal Cnty.,* 175 Ariz. 296, 300, 855 P.2d 1357, 1361 (1993) (noting that sufficient factual findings require the court to articulate "the essential and determinative facts on which the conclusion was reached" (citation omitted) (internal quotation marks omitted)).

¶47 Wife next contends that because she has fewer financial resources than Husband, the evidence did not support the denial of her request for attorneys' fees.[8] When considering an award of fees under § 25-324(A), the court is "obligated to consider . . . the degree of resource disparity between the parties, the ratio of the fees owed to assets and/or income of each party," as well as a party's ability to pay his or her own fees. *Magee v. Magee,* 206 Ariz. 589, 592-93, ¶ 17, 81 P.3d 1048, 1051-52 (App. 2004). However, and contrary to Wife's argument, the existence of a financial disparity does not *require* an award of fees to the poorer party. *Id.* at 593, ¶ 18, 81 P.3d at 1052 ("If the trial court finds such a disparity, it is then authorized to undertake its *discretionary function* of determining *whether an award is appropriate.*" (emphasis added)). Accordingly, we affirm the family court's denial of Wife's request for attorneys' fees.

### B. Order of Protection and Related Fees

¶48 Wife also contends that the court erred by awarding Husband fees relating to the OOP. We agree.

---

[8] Although not raised by the parties, we note that Wife withdrew $1,200,000 from HH immediately prior to filing for divorce. Even though she voluntarily returned some of those funds and was ordered to return more, she was permitted to retain $300,000 to pay attorneys' fees.

¶49 Wife obtained an ex-parte OOP in December 2010, but voluntarily had it dismissed in May 2011. Husband, however, requested a hearing in July but his request was subsequently denied as moot. Although the procedural rules for an OOP proceeding allow fees to be awarded, Arizona Rule of Protective Order ("Protective Rule") 2(C) provides that the court can only grant fees after a substantive OOP hearing. Because Husband did not timely request a substantive hearing and none was conducted, the award of fees is inconsistent with the requirement under both Protective Rule 2(C) and A.R.S. § 13-3602(P), that attorneys' fees may be awarded for an OOP after a hearing. Accordingly, we vacate the portion of the award of attorneys' fees granted to Husband as additional expenditures in response to the OOP.

¶50 Wife also argues that the court erred by awarding Husband fees to defend himself from her allegation that he committed computer fraud by intercepting her private correspondence. She specifically argues § 25-324 does not support the award of fees to Husband. Although the court found her actions improper, the court did not indicate the basis for the award to Husband. As a result, we remand the issue back to the family court to provide a basis for its ruling, whether under § 25-324(B) or other statute or rule, and, if appropriate, to award Husband fees relating to the criminal computer fraud claim.

### C. Motion for New Trial

¶51 Wife also argues that the court made insufficient findings to support the order awarding fees to Husband for responding to Wife's motion for new trial. The court awarded fees to Husband after finding that the motion for new trial was unreasonable because it raised arguments thoroughly litigated at trial or that should have been raised before or during trial.

¶52 We disagree with the court's ruling for two reasons. First, § 25-324(A) requires that the court make specific findings regarding both the parties' financial resources and the reasonableness of their positions. The court did not mention the parties' financial resources in its ruling.

¶53 Second, and more importantly, the Arizona Rules of Family Law Procedure ("Family Rule") permits a litigant to file a motion for new trial and raise perceived errors of law and to challenge certain rulings by claiming they were not justified by law or evidence. *See* Ariz. R. Fam. L.P. 83(A)(5) ("[E]rror in the admission or rejection of evidence or other errors of law occurring at the trial or during the progress of the action."); s*ee also*

16

Ariz. R. Fam. L.P. 83(A)(6) ("[T]hat the ruling, decision, findings of fact, or judgment is not justified by the evidence or is contrary to law."). Although it can be perceived that a litigant is being unreasonable by filing a motion for new trial within fifteen days of a judgment after a contentious trial, the Family Rules allow a party to seek a new trial. And, here, Wife's motion for new trial complied with Family Rule 83, and she now has prevailed on some of the issues raised in the motion. Consequently, because the motion was not unreasonable, we vacate the award of fees in the amount of $12,500 to Husband for responding to the motion for new trial.

### D.    Attorneys' Fees and Costs on Appeal

**¶54**        Both parties request an award of attorneys' fees and costs on appeal pursuant to A.R.S. § 25-324. Neither party took unreasonable positions on appeal. Despite Husband's greater earning ability, Wife also has a significant monthly income. As a result, in the exercise of our discretion, we deny both requests.

### CONCLUSION

**¶55**        Based on the foregoing, we: (1) vacate that portion of the decree limiting the duration of spousal maintenance to Wife and direct the family court to modify the decree, pursuant to PPA ¶ 5.7(D)(3), to indicate that Wife is entitled to 49.5 months of spousal maintenance; (2) vacate the portion of the ruling on the motion for clarification that ordered Husband to fund the joint account from June 1, 2011 to April 6, 2012 and modify the ruling on the motion for clarification and the decree to reflect that Husband's obligation to pay into the joint account began on December 19, 2010 and ended on April 9, 2012, and to make any division of the relevant funds; (3) affirm the decree's valuation of Wife's interest in HH; (4) affirm the order denying distributions from HH to Wife after February 3, 2011, but remand for consideration of whether Wife is entitled to payment of her portion of the community's federal and state tax obligations up to February 3, 2011 from HH; (5) affirm the decree that Husband's obligation to pay Wife additional spousal maintenance under MOU ¶ 2(m) terminates upon his death, but vacate the portion of the decree that such payments terminate upon Wife's remarriage; (6) affirm the order that Wife is responsible for one-half the mortgage payments Husband made for the marital house; (7) affirm the order denying Wife's request for attorneys' fees; (8) vacate the order awarding Husband fees in connection to the OOP; (9) remand to the family court to clarify its basis for awarding Husband fees in connection with allegation of criminal interception of private correspondence and, if appropriate, to grant fees only for that behavior; and (10) vacate the order

awarding $12,500 in attorneys' fees to Husband for responding to Wife's motion for new trial.



Ruth A. Willingham · Clerk of the Court
FILED: gsh