232 P.3d 99

**In re the Marriage of Scarlet CHOPIN, Plaintiff/Appellant,**

v.

**Marc C. CHOPIN, Defendant/Appellee.**

**No. 1 CA–CV 09–0427.**

Court of Appeals of Arizona,
Division 1, Department A.

June 3, 2010.

The Law Offices of John R. Gaertner, P.C. by John R. Gaertner, Jr., Scottsdale, Attorneys for Appellant.

The Law Office of Donald P. Frame, P.C. by Donald P. Frame, Flagstaff, Attorneys for Appellee.

## OPINION

BARKER, Judge.

¶1 Scarlet Chopin ("Wife") appeals the trial court's order (1) terminating the spousal maintenance she received from Marc C. Chopin ("Husband") and (2) denying her request for attorneys' fees and costs. We address the trial court's construction of the term "romantic cohabitation," which has not previously been addressed as a matter of Arizona law. For the following reasons, we reverse

termination of spousal maintenance and affirm denial of Wife's request for attorneys' fees and costs.

### *Facts and Procedural History*

¶ 2 Husband and Wife's marriage was dissolved on February 1, 2007. The parties incorporated into the decree of dissolution of marriage a spousal maintenance agreement, which provides:

> Husband shall pay Wife the amount of $2,500.00 per month, as and for spousal maintenance, for a period of eighty-four (84) months, commencing September 1, 2006, and Husband shall pay Wife the amount of $1,000.00 per month, as and for spousal maintenance, for a period of twelve (12) months, commencing September 1, 2013. Spousal maintenance shall terminate immediately upon Wife's remarriage or romantic cohabitation with anyone other than [A.R.]. The parties hereby agree that this provision regarding spousal maintenance shall be non-modifiable and the Court's jurisdiction over the issue of spousal maintenance is terminated forever.

¶ 3 At the time the parties negotiated the spousal maintenance agreement, they created an exception to the termination provision for Wife's anticipated romantic cohabitation with A.R. However, in January 2007, Wife became romantically involved with Robert Waddell. Wife and Waddell were formally engaged in January 2008, but their relationship ended in December 2008. During the relationship, Waddell periodically stayed overnight at Wife's house in Flagstaff, and Wife and Waddell vacationed together.

¶ 4 In October 2008, Husband filed a petition to terminate spousal maintenance alleging Wife had been romantically cohabitating with Waddell since January 1, 2008. Husband and Wife disputed both the meaning of "romantic cohabitation" and whether Wife and Waddell were romantically cohabitating. Following a hearing on the petition in April 2009, the trial court issued an order terminating Wife's spousal maintenance as of January 1, 2008, because it determined Wife and Waddell were romantically cohabitating.

The trial court subsequently denied Wife's motion for reconsideration, and Wife timely filed a notice of appeal.

¶ 5 We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

### *Discussion*

#### 1. *Meaning of "Romantic Cohabitation"*

■ ¶ 6 We review *de novo* the trial court's interpretation of a decree of dissolution. *Cohen v. Frey*, 215 Ariz. 62, 66, ¶ 10, 157 P.3d 482, 486 (App.2007). Generally, when a spousal maintenance agreement is merged into the decree of dissolution, the agreement becomes part of the decree. *LaPrade v. LaPrade*, 189 Ariz. 243, 247, 941 P.2d 1268, 1272 (1997). However, when a spousal maintenance agreement is incorporated into the decree, as it is here, the spousal maintenance agreement retains its independent contractual status and is governed by principles of contract law. *Id.* Under Arizona law, contracts "are to be given a reasonable construction" and "read in light of the parties' intentions as reflected by their language and in view of all circumstances." *Harris v. Harris*, 195 Ariz. 559, 562, ¶ 15, 991 P.2d 262, 265 (App.1999). "Contracts are to be construed to give words their ordinary, common sense meaning." *A Tumbling–T Ranches v. Flood Control Dist. of Maricopa County*, 220 Ariz. 202, 209, ¶ 23, 204 P.3d 1051, 1058 (App.2008).

■ ¶ 7 When extrinsic evidence[1] is offered to prove the meaning of a term in a contract, "the judge [should] first consider[ ] the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993). Extrinsic evidence is inadmissible if it "would actually vary or contradict the meaning of the written words." *Long v. City of Glendale*, 208 Ariz. 319, 328, ¶ 29, 93 P.3d

---

1. Extrinsic evidence includes "negotiation, prior understandings, and subsequent conduct." *Tay-* *lor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153, 854 P.2d 1134, 1139 (1993).

519, 528 (App.2004). "Whether contract language is reasonably susceptible to more than one interpretation so that extrinsic evidence is admissible is a question of law for the court," but the intent of the parties is a question of fact left to the fact finder. *Taylor*, 175 Ariz. at 158–59, 854 P.2d at 1144–45; *In re Estate of Lamparella*, 210 Ariz. 246, 250, ¶ 21, 109 P.3d 959, 963 (App.2005).

¶ 8 "Romantic cohabitation" is not a statutorily defined term and there are no Arizona cases interpreting "romantic cohabitation" as used in spousal maintenance agreements. Focusing our attention on the words at issue, we turn to dictionaries for their common and ordinary meaning. Black's Law Dictionary defines "cohabitation" as "[t]he fact or state of living together, esp. as partners in life, usu. with the suggestion of sexual relations." Black's Law Dictionary 277 (8th ed. 2004). Merriam–Webster's Collegiate Dictionary defines "cohabit" as "to live together as or as if a married couple." Merriam–Webster's Collegiate Dictionary 222 (10th ed. 2001). "Romantic" means "consisting of or resembling a romance." *Id.* at 1013. "Romance" is defined as "to carry on a love affair with." *Id.*

¶ 9 Wife argues "romantic cohabitation" occurs when someone provides financial support to another and lives with him or her in a romantic manner. At the evidentiary hearing, Wife testified that, in her view, financial support was a major component of "romantic cohabitation." In particular, Wife had the following exchange with her attorney during direct examination:

Q. Now, at the time of your divorce, you had a clause that dealt with "romantic cohabitation"?

A. Yes.

Q. What was your discussion with [Husband] at the time of the divorce with regard to what romantic cohabitation meant?

A. Um, [Husband] asked if we could add that clause, after we had already negotiated all of the other elements of our settlement, and he said it was because— Sorry. He said it wouldn't be fair if somebody else moved into my house and was helping to provide support for me, that he shouldn't also be obligated to do that.

And I agreed with that. I said that that was fair, that if I had another partner, a romantic partner, and they were providing financial help, then he shouldn't also be obligated to do that. And I agreed with that and thought that was fair.

And I thought I understood what it meant as we were discussing it, that it would mean taking up a primary residence with somebody, meaning they actually had to physically move their belongings into your home.

¶ 10 At the time the agreement was formed, Wife negotiated that A.R. be excluded from the agreement because Wife was romantically involved with A.R. and planned for A.R. to move into Wife's home, contribute to the mortgage, and pay half of the household expenses. Based on the discussion with Husband regarding the A.R. exception, Wife believed "romantic cohabitation" meant that she would "have to physically live with someone and take up residence with them, have that as their official place of residence, address, domicile, and ... would have to share expenses. They would have to contribute to [her] household, help pay for the mortgage, the bills, et cetera."

¶ 11 Husband testified that at the time he and Wife entered into the agreement, he understood "romantic cohabitation" to mean: "[t]o live together as something more than roommates. To be romantically, emotionally involved together and to live in the same household." Husband also testified that the word "romantic" was used in order to "differentiate that from the simple roommate arrangement." At the time the parties negotiated the agreement, Husband knew Wife potentially needed a roommate to share her household expenses and added the word "romantic" to "cohabitation" because he "did not want a roommate to count against her with respect to spousal maintenance." "Romantic cohabitation," Husband testified, also encompassed a marriage-like relationship with any partner. Husband further indicated that he understood "cohabitate" to mean: "[t]o live together. To live together as husband and wife, or to portray themselves as

being husband and wife or the equivalent relationship."

¶ 12 Neither party's interpretation of "romantic cohabitation" necessarily contradicts or varies the termination provision in their spousal maintenance agreement. Thus, as a matter of law, the spousal maintenance agreement is reasonably susceptible to both parties' constructions of "romantic cohabitation," and the trial court properly admitted the extrinsic evidence proffered by each of them.

¶ 13 Based on the evidence presented, the trial court made a factual determination that the parties did not intend "romantic cohabitation" to include a financial support requirement. The trial court determined "romantic cohabitation" means "liv[ing] together and behav[ing] as a married couple." We accept this determination as it is supported by dictionary definitions of "cohabitation" and Husband's testimony regarding negotiation of the term. *In re Marriage of Berger,* 140 Ariz. 156, 162, 680 P.2d 1217, 1223 (App.1983) ("If there is any credible evidence to support the trial court's findings, we must accept those findings.").

¶ 14 While "living together and behaving as a married couple" is a permissible definition of "romantic cohabitation," this is not the legal standard the trial court applied to the facts. The court did not give effect to the requirement of actually "living together." The court stated:

12. The amount of time it takes to live together or behave as a married couple is relative.

13. If two people are legally married, there is no minimum amount of time required before they cohabitate.

. . . .

16. In today's world, it is not uncommon for people to enter into various living arrangements, whether they are married or unmarried. Not every married couple shares finances. Not every unmarried couple keeps their finances separate. Not every married couple lives in one house. Not every unmarried couple lives separate.

¶ 15 These statements indicate the trial court incorrectly interpreted "romantic cohabitation" to encompass any variety of living arrangements in which a married couple might engage. For example, in the trial court's analysis, a couple who does not physically live together still may fall within the definition of "romantic cohabitation" because not all married couples physically live together. By this analysis, the trial court gave no meaning to the term "cohabitation" in the phrase "romantic cohabitation." However, "[t]he controlling rule of contract interpretation requires that the ordinary meaning of language be given to words where circumstances do not show a different meaning is applicable." *Chandler Med. Bldg. v. Chandler Dental Group,* 175 Ariz. 273, 277, 855 P.2d 787, 791 (App.1993). The trial court cannot ignore the plain meaning of "cohabitation," which both parties agree means Wife must "live together" with someone.

¶ 16 The trial court used a variety of living arrangements in marriage to define the meaning of "romantic cohabitation." For example, the court stated "not every married couple shares finances . . . not every married couple lives in one house." The trial court's finding that a "cohabitating" couple need not actually reside together, however, removes from the term "cohabitation" its fundamental meaning: "living together."

¶ 17 As stated previously, there are no Arizona cases that define "cohabitation," and no statutes to give it meaning in this setting. Other courts, however, have addressed this issue. As a general guideline, we agree with the courts in Michigan and Ohio that have identified three elements in determining whether cohabitation exists:

First, there must be an actual living together, that is, the man and woman must reside together in the same home or apartment. Secondly, such a living together must be of a sustained duration. Thirdly, shared expenses with respect to financing the residence (i.e., rent or mortgage payments) and incidental day-to-day expenses (e.g., groceries) are the principal relevant considerations.

*Smith v. Smith*, 278 Mich.App. 198, 748 N.W.2d 258, 261 (2008) (citation omitted); *see Moell v. Moell*, 98 Ohio App.3d 748, 649 N.E.2d 880, 883 (1994) ("[T]he trial court should look to three principal factors .... '(1) an actual living together; (2) of a sustained duration; and (3) with shared expenses with respect to financing and day-to-day incidental expenses.' " (citation omitted)). Other factors are appropriate to consider. They may include:

> [W]hether [they] intended to cohabitate; whether they held themselves out as living together; whether they assumed obligations generally arising from ceremonial marriage; whether a sexual relationship existed; whether marriage was contemplated; whether they used one another's addresses; whether they kept joint accounts; whether they were economically interdependent....

*Smith*, 748 N.W.2d at 261. This listing is not exhaustive nor is it a "checklist" that will necessarily apply to each case.

¶ 18 Other jurisdictions have considered a variety of evidentiary factors, some of which require living together and some of which do not. *See e.g., Sanders v. Burgard*, 715 So.2d 808, 811 (Ala.Civ.App.1998) (holding cohabitation requires proof of (1) permanency of the relationship and (2) more than occasional sexual activity); *Quisenberry v. Quisenberry*, 449 A.2d 274, 276–77 (Del.Fam.1982) (holding cohabitation has no financial component but requires two persons of the opposite sex live together in a stable, marriage-like relationship); *In re Marriage of Herrin*, 262 Ill. App.3d 573, 199 Ill.Dec. 814, 634 N.E.2d 1168, 1171 (1994) (holding cohabitation is based on the totality of the circumstances and courts should consider "(1) its length; (2) the amount of time [the couple] spent together; (3) the nature of the activities they engaged in; (4) the interrelation of their personal affairs; (5) their vacationing together;

and (6) their spending holidays together"); *Baker v. Baker*, 566 N.W.2d 806, 811 (N.D. 1997) (stating non-exclusive factors to consider are "establishment of a common residence; long-term sexual, intimate or romantic involvement; shared assets or common bank accounts; joint contribution to household expenses; and a recognition of the relationship by the community"); *Rose v. Csapo*, 359 N.J.Super. 53, 818 A.2d 340, 344 (N.J.Super.Ct.Ch.Div.2002) (finding cohabitation "involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage[,] ... [which] can include ... living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle" (internal citation omitted)); *see also* Cynthia L. Ciancio & Jamie L. Rutten, *Modifying or Terminating Maintenance Based on Cohabitation*, Colo. Law., June 2009, at 45, 46–48 (focusing on Colorado law but also identifying the effect of cohabitation on spousal maintenance agreements in other jurisdictions); Diane M. Allen, *Divorced or Separated Spouse's Living with Member of Opposite Sex as Affecting Other Spouse's Obligation of Alimony or Support Under Separation Agreement*, 47 A.L.R.4th 38 (1986 & Cum.Supp.) (analyzing cases regarding whether a divorced or separated spouse's cohabitation with a person of the opposite sex modifies or terminates spousal support).[2]

¶ 19 We hold, however, that unless the parties specifically define the term differently, one indispensable factor in establishing "cohabitation" is that there be a physical "living together." Otherwise, there is no "cohabitation." Without such construction, the term "romantic cohabitation" as utilized by the parties could mean a romantic relationship based solely on regular sexual activity

---

2. Some states have a statutory definition for "cohabitation." Fla. Stat. § 61.14(1)(b), (2) (West 2008) (stating the court may modify or terminate an alimony award if the obligee is in a "supportive relationship" and identifying eleven factors courts must consider when determining if a "supportive relationship" exists); N.C. Gen.Stat. § 50–16.9(b) (West 2009) (stating alimony terminates when the dependent spouse engages in

cohabitation, which "means the act of two adults dwelling together continuously and habitually in a private heterosexual relationship"); S.C.Code Ann. § 20–3–150 (West Supp.2007) (specifying that permanent alimony ceases upon "continued cohabitation," which means the "supported spouse resides with another person in a romantic relationship for a period of ninety or more consecutive days").

rather than a romantic relationship in which the involved individuals actually live together. Here, the parties did not define the pertinent term to exclude the requirement of "living together." Accordingly, the trial court erred.

¶ 20 Although Wife and Waddell were romantically involved beginning in January 2006 and formally engaged from January 2008 until December 2008, they each maintained separate residences in Flagstaff and never lived together. Waddell was the resident landlord at his Flagstaff house and was responsible for yard care and maintenance work. Waddell testified that, during a six-month period, he spent one out of every six days at Wife's house, which he agreed was between twelve and eighteen percent of the time. Husband presented no substantial evidence from which the trial court could reasonably determine that Waddell spent more time at Wife's home. Based on the evidence, Waddell spent the remainder of his time at his house, at his home office when he had one, at work in Phoenix, or at his work study sites. Waddell testified that when he was in Flagstaff, there was "hardly a day that [went] by" that he was not at his house. Waddell stayed with Wife more often in March and April of 2008 when he was remodeling his house and a "little bit more" often from May to August of 2008 because his house was "staged" for sale. This is consistent with the April 2008 observations by Husband's investigator. Waddell stored a few things of value in Wife's garage but did not keep clothing at Wife's house. With one

exception, Waddell never received mail at Wife's house.[3]

¶ 21 On this record, Wife and Waddell were not living together, and thus, not "romantically cohabitating"; at best, Waddell was a guest at Wife's house about once a week.[4] Therefore, the trial court erred by ordering termination of Wife's spousal maintenance.[5]

## 2. Attorneys' Fees and Costs

¶ 22 Wife requested the trial court order Husband to pay her attorneys' fees and costs in opposing the petition to terminate spousal maintenance. Although the trial court did not rule on the re quest, we deem it denied. *See State v. Hill*, 174 Ariz. 313, 323, 848 P.2d 1375, 1385 (1993) (stating that when a court fails to make a ruling on a motion it is treated as denied). On appeal, Wife argues the trial court abused its discretion in denying her request pursuant to A.R.S. § 25–324 because there was a disparity in income between Husband and Wife. Wife, however, waived this argument by failing to assert a statutory basis for her fee request before the trial court. *See Woodworth v. Woodworth*, 202 Ariz. 179, 184, ¶ 29, 42 P.3d 610, 615 (App.2002) (finding party waived issue of mandatory attorneys' fees by failing to assert statutory basis for award before the trial court); *see also Schoenfelder v. Ariz. Bank*, 165 Ariz. 79, 88, 796 P.2d 881, 890 (1990) ("As a general rule, we will not review an issue on appeal that was not argued or factually established in the trial court.").

---

**3.** A woman in Canada, whose luggage was mistakenly delivered to Wife's house, mailed Waddell a letter at Wife's address thanking Waddell for his assistance in returning her luggage to Canada.

**4.** Husband contends other considerations such as (1) Wife and Waddell's vacation trips together, (2) Wife's allowing Waddell's out-of-town family and friends to stay the night in her house when they visited Flagstaff, (3) Waddell driving Wife's daughter to school on occasion, (4) Waddell listing Wife as a beneficiary of his life insurance policy, and (5) Wife and Waddell's couple's gym membership demonstrate that Wife and Waddell were romantically cohabitating and provide sufficient evidence such that we should affirm. We disagree with Husband. As described herein,

"cohabitation" at its core means a couple must physically live together. We are also not persuaded by Husband's argument that Wife and Waddell's water usage records establish romantic cohabitation because the number of people in each household, Wife's lawn watering system, and Waddell's work schedule explain the difference in water usage at their respective houses.

**5.** Because termination of spousal maintenance was improper, we need not address Wife's contentions (1) that romantic cohabitation is not a sufficient ground to terminate spousal maintenance under A.R.S. § 25–327 and (2) that January 1, 2008, was an improper effective date for termination of spousal maintenance pursuant to A.R.S. § 25–327.

¶ 23 Moreover, even if Wife had cited A.R.S. § 25–324 as the basis for her request, it was not an abuse of discretion for the trial court to deny the request. Section 25–324(A) states that "after considering the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings," the trial court "may order a party to pay a reasonable amount to the other party for the costs and expenses of maintaining or defending any proceeding." A.R.S. § 25–324(A) (Supp. 2009). Wife failed to support her request for fees and costs with any evidence of Husband's current financial resources. The parties did not file affidavits of financial information as required by Arizona Rule of Family Law Procedure 91(S), and Husband's only financial evidence in the record was over two years old from the date the trial court issued its order terminating spousal maintenance. Accordingly, the trial court did not abuse its discretion by denying Wife's request. *Breitbart–Napp v. Napp*, 216 Ariz. 74, 83–84, ¶ 37, 163 P.3d 1024, 1033–34 (App.2007) (reversing trial court's award of attorneys' fees and costs because it was not supported by adequate financial information in the record); *Gerow v. Covill*, 192 Ariz. 9, 19, ¶ 45, 960 P.2d 55, 65 (App.1998) (denying husband's request for fees because he "provide[d] no information about the financial resources of either party nor d[id] he provide evidence supporting his claim for fees.").

¶ 24 Husband and Wife both request attorneys' fees and costs on appeal pursuant to Arizona Rule of Civil Appellate Procedure 21 but fail to specify a statutory basis for the award on appeal. We therefore deny their requests for fees. *Bed Mart, Inc. v. Kelley*, 202 Ariz. 370, 375, ¶ 24, 45 P.3d 1219, 1224 (App.2002) (denying fees request pursuant to Arizona Rule of Civil Appellate Procedure 21 because "it does not provide a substantive basis for a fee award"). As the prevailing party on appeal, however, Wife is entitled to recover her costs on appeal pursuant to A.R.S. § 12–341 (2003). We award her those costs upon her compliance with Arizona Rule of Civil Appellate Procedure 21.

### *Conclusion*

¶ 25 For the foregoing reasons, we reverse the trial court's order terminating spousal maintenance and affirm the order denying Wife's request for attorneys' fees and costs. Wife is entitled to reinstatement of spousal maintenance payments beginning January 1, 2008.

CONCURRING: LAWRENCE F. WINTHROP, Judge, and DIANE M. JOHNSEN, Judge.